## LITTLE *versus* WATSON.

The title to lands, granted by the Sovereign Power upon a condition to be subsequently performed within a limited time, will remain valid, until such grantor, by some Legislative Act, shall avail itself of a forfeiture.•

The time allowed for performing such a condition, prescribed in a grant, made by Massachusetts prior to the separation of that State from Maine, of lands situated in this State, may yet be extended by the Legislature of that Commonwealth, notwithstanding the separation.

Although the preamble to a treaty does not form a part of the contract, yet being authenticated by the signatures of the contracting parties, its averments are to be regarded as admitted truths.

When the language used in a treaty clearly declares a fact, or grants, confirms or defines a right, it must be effectual, even if found to be inconsistent with the purpose disclosed by the correspondence which preceded it.

The treaty of Washington, of 1842, asserts, that that part of the line, which divided the territory of the United States from the territory of the Province of New Brunswick, and which lay between the monument at the source of the St. Croix river and the river St. John, was never ascertained and determined; and the fact thus asserted is not to be brought into question.

The treaty of Washington established, between the said monument and the St. John river, a new conventional line of boundary between this State and the Province of New Brunswick, irrespective of the line provided for by the treaty of Paris, made in 1783.

One who, at the time of the ratification of the treaty of Washington, was and for several years previously had been, in possession of land under a grant from said Province, has a title, which by the fourth article of said treaty is " held valid, ratified and confirmed" to him, although said land in fact lies within the limits of the United States, as established conventionally by the same treaty.

That provision of the treaty is binding upon this Court, without the interposition of any legislative action.

Grants of land made by authority of the British Government, and coming

within the scope of that provision, cannot, therefore, be vacated, even in a suit for the same land bought by a grantee of the State, within whose territory it is found to belong.

WRIT OF ENTRY. The land borders upon the *conventional* line of boundary, between the United States and the Province of New Brunswick, established by the treaty of Washington. It lies west of that line and far south of Mars Hill.

The demandant deraigns title in himself under a grant from the Commonwealth of Massachusetts made in 1802. At the time of the ratification of the treaty of Washington, in 1842, the tenant was, and for several years previously had been, in possession and actual occupation of the land, under a grant from the Province of New Brunswick. He now claims to hold it under the fourth article of that treaty, which provides, that " all grants of land heretofore made by either party within the limits of the territory, which, by this treaty, falls within the dominions of the other party, shall be held valid, ratified and confirmed to the persons in possession under such grants, to the same extent as if such territory had, by this treaty, fallen within the dominions of the party, by whom such grants were made."

The case was submitted to the court, upon facts agreed, the material parts of which are more fully presented in the opinion.

*Rowe & Bartlett,* for the demandant.

Apart from the fourth article of the treaty of Washington, the title of the demandant is indisputable, and if it is defeated by that article, he is remediless.

When the grant was made by Massachusetts, the boundary line had not been ascertained. By mistake the surveyor extended the township too far eastwardly ; so that when the boundary was ascertained, it was found, that 1600 acres of the grant were within the territory of New Brunswick. For relief against that error, the demandant received from the Commonwealth $1000, upon their warranty of title. But the land *now* in controversy lies *west* of the boundary line

of the State, and he can have no call upon any one for redress, if he fail in this suit.

Can that article of the treaty operate so palpable a wrong? The tenant contends, that it is by *that treaty*, that the land falls within the United States. But we contend, that *irrespective of that treaty*, the land belonged to this Government. And such is the conclusion to which the mind must be led, by the history of the negotiation, and the condition of affairs upon which it was intended to operate.

This article looked to the *disputed territory* alone, and had no reference to lands south of Mars Hill. It was inserted in the treaty for the sole and avowed purpose of prctecting the Acadian refugees, the "*habitans*" of Madawaska, and other settlers on the Upper St. John, and the Aroostook. The Legislatures of both States passed resolves for the appointment of commissioners to accomplish that object. And when the commissioners, under those resolves, had completed their labors, this part of the treaty was fully executed.

The question of compensation to the states, whose lands were to be taken, was discussed in the correspondence, and the amount fixed upon, and inserted in the treaty, but not one word as to compensation to individuals. These matters need no proof. They belong to public history.

The treaty, then, was not *intended* to confirm grants, or provide for the release of lands *belonging to individuals*, by prior grants, or of lands lying any where out of the *disputed territory*.

Does the *language* of the treaty necessarily express any such intention? "Grants of land within the limits of the territory, which, *by this treaty*, falls within the dominions," &c., is the expression.

The disputed territory lay North of Mars Hill. No part of our territory fell to us by this treaty, *except our portion of that which was in dispute.* No new line was established by this treaty any where else in this State. A new *conventional* line was agreed upon there, because it was found to be impossible to trace the line of the treaty of 1783, owing to the

ambiguity of the language used in describing some of its monuments. But the line *south of Mars Hill* was involved in no such uncertainty. It was clearly described and could be traced with mathematical precision. The treaty of Washington adopts and confirms it, and declares, that it is the true line. Nor can it be denied, that the line of the treaty of Washington is a due north line, for the treaty asserts it to be so. The eastern boundary of the demanded premises is this line ; and this line is also the line of the treaty of 1783. Of course, then, the demanded premises are not within the scope of the fourth article of this treaty. For a confirmation of these views, we respectfully refer to the case of *Henderson* v. *Poindexter*, 12 Wheat. 530, 534.

If this be so, here is an end of defendant's case. If it be not so, then we claim for the plaintiff the protection of the constitution of the United States, which declares, [in Amendments Art. 5,] that private property shall not be taken for public uses, without compensation.

Our position is, not that this clause of the treaty is void, but that it cannot be enforced at present, against private property ; not that it is without effect on private property, but that its operation is suspended till Congress shall pass a law providing for the necessary compensation. It cannot be enforced in this case *now*. It has been decided, under a similar provision in the constitution of this State, that compensation, in such cases, must be made, or provided for, when the property is taken, and, unless that be done, the court will not enforce the law taking property. *Comins* v. *Bradbury*, 1 Fairf. 447. This rule may not be applicable in its full extent, to a treaty provision, which may have the force of a law operating directly upon the subject, or may be a contract merely, requiring a legislative act to give it force. The Supreme Court of the United States. in *Foster* v. *Nielson*, 2 Pet. 253, distinguish between treaties, which act directly on the subject, overruling laws repugnant to them, and treaties which are: in the nature of a contract, requiring subsequent legislation to

carry them out. As to the latter they say, that, until such acts of the Legislature are passed, the court are not at liberty to disregard existing laws. If this clause of the treaty is inoperative now, it may hereafter become operative when Congress shall have passed the necessary law to carry it into effect.

*J. Hodgdon*, for the tenant.

In the case *United States* v. *Pencheman*, 7 Pet. 8, it was held, that the words respecting titles in the Spanish treaty, " shall remain ratified and confirmed," were not a contract, *to be* executed *in futuro*, but as operating *per se*, without legislative intervention.

The words in the treaty of Washington, " shall be held valid, ratified and confirmed," are not less indicative of a title executed.

The demandant claims under a grant from Massachusetts. That claim is of no avail, for : —

1. The possession mentioned in the fourth article of the treaty intends, not a legal constructive possession, but an actual occupation. At least where such an occupation existed, it took priority to a mere constructive possession.

Now the tenant was not only holding under a grant from New Brunswick, but was, at the execution of the treaty, in the *actual occupation*. These are the only elements required to confer on him a perfect title, under that article.

2. The tenant's title is confirmed by the treaty, as a necessary result of the dissimilarity between the constitutions of the United States and of Great Britain.

By the latter, a treaty is an *executive* act, and when brought into conflict with vested individual rights or public laws, it requires *legislative* action to give it effect. The treaty stipulation is, that this grant is confirmed to the same extent as if such territory had, by the treaty, fallen within the dominions of New Brunswick. But if, on the divisional line, this land had fallen to New Brunswick, this plaintiff could maintain no action for it, because there have been no enactments of the Imperial Parliament, or of the Provincial Assembly, by which

any effect could be given to prior grants, from Massachusetts or Maine.

3. Demandant is estopped, by his own act, from claiming under the treaty of Washington. He petitioned for and received from the Legislature, an indemnity for his lands lying east of the cut out line, asserting that, by the treaty, they were lost to him. This was an admission that his title could not be sustained in the British courts. But the treaty, if it confirmed British grants up to the American line, equally confirms them on the American side of the line.

Hence, the demandant's claim was upon Massachusetts, to whom remuneration is to be made by the General Government.

4. The demandant has failed to establish any title; for the grant of Massachusetts, under which he claims, was but a conditional one, and the conditions were not performed. The Act of that State, extending the time for performing the condition, was passed after the separation of Maine, who thereupon became interested in the title, and the Act of Massachusetts, without the concurrence of Maine, could have no effect.

SHEPLEY, C. J. — The lands demanded are admitted to have been included within the bounds of a township of land conveyed by the Commonwealth of Massachusetts, by its agents, John Reed and Peleg Coffin, to the trustees of Williams College, on February 2, 1802. It is also admitted, that the demandant by virtue of the conveyance made to him on Aug. 23, 1832, by Daniel N. Dewey, as the agent of the trustees, acquired all the title which could be conveyed by them, if they had made no prior conveyance.

The objection to the title derived from the trustees is, that the conveyance to them was made upon condition, that they should cause fifteen families to be settled upon the township within twelve years, which was not performed. The condition was to be performed subsequently; and in such case the title would continue to be valid, until the State should by some legislative Act make known its pleasure, that it should

become forfeited. This it did not do ; but by a resolve it extended the time for performance of the condition, which was performed within the further time allowed. But it is said, that Massachusetts could not legally extend the time, after this State was separated from that, without the assent of this State. This objection is without foundation. The Act of Massachusetts providing for the separation of this State declares, that " all rights of action for, or entry into lands, and of action upon bonds for the breach of the performance of the conditions of settling duties, so called, which have accrued or may accrue, shall remain in this Commonwealth to be enforced, commuted, released or otherwise disposed of in such manner, as this Commonwealth may hereafter determine." This Act was assented to by the State of Maine, and made a part of her constitution ; and it fully authorized Massachusetts to extend the time allowed for the performance of the condition contained in the deed of conveyance to the trustees of the college.

The demandant, it is said, is estopped or precluded from asserting any title to the premises demanded by his petition, presented to the Legislature of Massachusetts, and by the reception of the compensation granted to him by that State for the loss of lands conveyed to the trustees of Williams college.

That petition, presented in the year 1845, represented that the title to sixteen hundred acres proved to be invalid, because the bounds of the township were extended into the Province of New Brunswick ; and it prayed for compensation therefor, which was made, not for the loss of lands ascertained by the treaty of Washington to be within this State, but for the loss of those ascertained to be within the province of New Brunswick.

The lands demanded are within this State ; and they were legally conveyed by Massachusetts to the trustees of Williams college, and by their agent to the demandant, who will be entitled to recover them, unless his title was destroyed by the provisions of the treaty of Washington, bearing date on August 9, 1842.

Little *v.* Watson.

The title of the tenant is derived from a grant of the lands demanded, made on August 12, 1841, by the province of New Brunswick to George Watson ; and from a conveyance thereof made by George Watson and wife to himself on August 6, 1842. It is admitted, that the tenant has been in the undisturbed occupancy of the premises, for ten years before the commencement of the action on December 3, 1846, and that he has erected buildings upon and cultivated a part of the lands. He was thus in possession of the premises, when the treaty of Washington was made, claiming title under a grant from the province of New Brunswick, of lands actually within the limits of the United States, and already conveyed by the Commonwealth of Massachusetts.

The fourth article of the treaty of Washington contains this clause, "All grants of land heretofore made by either party within the limits of the territory, which by this treaty, falls within the dominions of the other party, shall be held valid, ratified and confirmed to the persons in possession under such grants to the same extent, as if such territory had by this treaty, fallen within the dominions of the party, by whom such grants were made."

Upon a literal construction of the language of the treaty, the tenant presents a title within its provisions and protected by them. The literal is the correct construction of such an instrument, when the language is clear, precise, not inconsistent with other provisions, and not leading to absurd conclusions. Vattel, lib. II, c. 17. And in such case no extraneous means for an interpretation of the treaty should be sought.

The argument for a different construction is in substance, that the line established by the treaty of peace of 1783 extended due north from the monument erected at the source of the river St. Croix ; that by the line so established the premises were within the United States ; that the treaty of Washington only confirmed that line, and that the premises did not therefore fall within the dominions of the United States by the treaty of Washington.

Although the preamble of a treaty does not form a part of the contract, yet being duly authenticated by the signatures of the contracting parties, its averments are to be regarded as truths admitted. When the language used in a treaty clearly declares a fact, or grants, defines, or confirms a right, it must be effectual, even if found to be inconsistent with the purpose disclosed by the correspondence, which preceded it.

The preamble to the treaty of Washington recites, that " certain portions of the line of boundary between the United States of America and the British Dominions in North America described in the second article of the treaty of peace of 1783, have not yet been ascertained and determined, notwithstanding the repeated attempts, which have been heretofore made for that purpose ; and whereas it is now thought to be for the interest of both parties, that avoiding further discussion of their respective rights arising in this respect, under the said treaty, they should agree on a conventional line in said portions of the said boundary, such as may be convenient to both parties with such equivalents and compensations, as are deemed just and reasonable." Here is a distinct declaration, that the parties intended to agree on a conventional line, without regard to certain portions of the line established by the treaty or 1783 ; and an admission, that in those parts of the line, it had not been ascertained and determined. The admission of this uncertainty, was co-extensive with the conventional line agreed on. The first article then proceeds to establish a line beginning at the monument, and "thence north following the exploring line, run and marked by the surveyors of the two governments in the years 1817 and 1818, under the fifth article of the treaty of Ghent, to its intersection with the river St. John." This must, therefore, be regarded as a part of the conventional line ; and although it does not run from the monument north, yet it must follow the exploring line, whether it should or should not be found to run on a course due north. If, as the preamble to the treaty admits, the line between the two countries from the monument to the river St. John had not been ascertained and

determined, the premises did fall within the United States by the line established by the treaty of Washington, and not by any former line agreed upon between the parties.

It is further insisted, that the intention was not, and that the construction should not be such, as to confirm grants of land made in the vicinity of this portion of the line, but those only, which had been made north of Mars Hill and near the Madawaska settlement. The correspondence, which preceded the treaty, is referred to as conclusive proof, that the clause in the fourth article of the treaty, and indeed the whole article, was introduced for that purpose alone.

Admitting the occasion of its introduction to be correctly stated, yet when language was used equally applicable to those and to other grants, the argument cannot be sound, which would introduce a limitation of such general language to grants of a particular class not named in the treaty to the exclusion of others equally embraced by the language used. It is more reasonable to conclude, that the negotiators perceiving the necessity of such provisions, to confirm one class of grants, concluded to make the provisions general, that it might include grants made upon other portions of the line, if such should be found, instead of restricting them to a class of grants especially calling for those provisions. There would, in such case, be nothing inconsistent with each other in the correspondence and treaty stipulations. A judicial tribunal would not be authorized to limit the plain and unrestricted language of a treaty to the accomplishment only of the particular purposes, which induced the parties to introduce each article. The intention is to be ascertained rather from the ambiguous language finally agreed upon, than from the anterior correspondence.

It is further insisted, that the treaty does not operate upon the title or grant *proprio vigore*, but only as a contract requiring legislative interposition to carry it into effect.

A treaty is usually a contract between the parties. It may, however, be so framed as to accomplish its purposes without any further act, if the language used be suitable, and the purpose be such as may be thus accomplished. In the United

States a treaty is to be regarded as the supreme law and operative as such, when the stipulations do not import a contract to be performed. It is true, that the language used in the treaty between the United States and Spain, made on Feb'y 22, 1819, was not regarded in the case of *Foster* v. *Nielson*, 2 Peters, 314, as operative *per se*, to confirm the grants alluded to ; but when the language used in the Spanish duplicate came before the court in the case of the *United States* v. *Pencheman*, 7 Peters, 51, 88, it was decided to be operative upon the grants without any legislative interposition. The provision of the treaty as presented in the former case, declared, that grants made before a certain period "shall be ratified and confirmed", and as presented in the latter case, "shall remain ratified and cofirmed." There is an essential difference between the language, upon which the court acted in the case of Foster and Neilson, and that used in the treaty of Washington, which provides, that grants of land "shall be held valid, ratified and confirmed", which does not contemplate any future act as necessary to the validity, ratification, or confirmation, of the grant. They are held to be so by those, whose duty it may be to act upon them. The language addresses even more appropriately the judicial than the legislative department. It is the duty of this court to consider, that treaty to be a law operating upon the grant made under the authority of the British government, and declaring, that it shall be held valid, ratified and confirmed.

It is further insisted, that it cannot be permitted so to operate and thereby defeat the title of the demandant to the land without a violation of that provision of the constitution of the United States, which declares, that private property shall not be taken for public use without just compensation. It is not in the argument denied, that public or private property may be sacrificed by treaty ; but it is said that such a provision of a treaty as would take private property without compensation, must remain inoperative or suspended, until compensation has been made.

Such a construction would infringe upon the treaty-making

power, and make its acts depend for their validity upon the will of the legislative department, while the constitution provides, that treaties shall be the supreme law.

The clause of the constitution referred to, is a restriction imposed upon the legislative department, in its exercise of the right of eminent domain. It must of necessity, have reference to that department, which has the power to make compensation, and not to the treaty-making power, which cannot do it. This provision of the constitution will not prevent the operation of the treaty upon the grant of the tenant. *Ware* v. *Hilton*, 3 Dallas, 236 ; *United States* v. *Schooner Peggy*, 1 Cranch, 110. The demandant must seek compensation for the loss of his land, from the justice of his country.

*Demandant nonsuit.*